D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
TETYANA MOSKALENKO, on her own behalf
and on behalf of all other Seafarers similarly situated,

                                Plaintiff,

                                -against-

CARNIVAL PLC and FLEET MARITIME
SERVICES INTERNATIONAL, LTD.,

                                Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**17-CV-6947 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Tetyana Moskalenko brings this putative class action under the Seaman's Wage Act, 46 U.S.C. § 10313, New York Labor Law, Article 6, §§ 193 and 196-d, and the Declaratory Judgment Act, 28 U.S.C. § 2201 (Compl. (Dkt. 1).) Before the court is Defendants' motion to compel arbitration pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "Convention"), and its implementing legislation, Chapter Two of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 202-208, and Federal Rule of Civil Procedure 12(b)(3) (the "Motion"). (Mot. to Dismiss (Dkt. 18); see Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt. 18-1).) For the reasons that follow, Defendants' Motion is GRANTED.

I.    BACKGROUND

    A.    Facts

Plaintiff Tetyana Moskalenko is a citizen of Ukraine. (Compl. ¶ 6.) Defendant Carnival PLC is a corporation organized under the laws of England and Wales, with its principal place of business in Southampton, England. (Id. ¶ 8.) Defendant Fleet Maritime Services, Ltd. is a subsidiary of Defendant Carnival PLC. (Id. ¶ 9.)

1

Between 2007 and 2018, Defendant Fleet Maritime Services employed Plaintiff to serve as a Bedroom Stewardess on the ocean liner, Queen Mary 2. (Id. ¶¶ 6-7.) Queen Mary 2 operates a route between New York and Southampton, England, and calls on ports in New York, Massachusetts, Rhode Island, and Maine. (Id. ¶ 10-11.) Red Hook, Brooklyn is considered one of the ship's home ports. (Id. ¶ 11.)

Plaintiff asserts claims based on Defendants' alleged failures to: (1) properly compute her share of the gratuities/service charges collected from passengers; (2) appropriately staff the ship such that Plaintiff was forced to hire and personally pay for helpers to complete her assigned tasks; and (3) timely pay Plaintiff's wages. (See id. ¶¶ 20-55.)

Plaintiff alleges that over the course of her employment, she entered into nine "similarly-worded Seafarer's Employment Agreements with Defendant Fleet Maritime Services," each of which covered a period of eight-to-ten months. (Id. ¶¶ 17, 19.) Plaintiff and another seafarer, who "wishes to join this action," signed nearly identical boilerplate declarations stating that these contracts were never explained to them, that they were not permitted to negotiate the terms, and that their principal reason for signing the contracts was to ensure that they could provide for their families. (See Decl. of Tetyana Moskalenko (Dkt. 19-1) ¶¶ 3-6; Ex. 3, Decl. of Vlasova Victoria (Dkt. 19-2) ¶¶ 3-6.) Defendants aver that crewmembers signed Part A of the agreements and that Part B, which contained the standard terms and conditions of their employment, was retained by crewmembers. (Reply (Dkt. 20) at 3 n.2.) Because these contracts are central to the Defendants' Motion, the court explains in detail the allegations related to the contracts' material provisions and the examples of these agreements submitted by the Defendants.

Plaintiff alleges that the nine contracts she signed were "similarly-worded." (Compl. ¶ 19.) The court infers from her filings, in which she quotes language from Part A and Part B

without indicating that this language varied in any way from one agreement to the next, that the relevant passages in those documents did not differ in material respects at any point during her employment. Plaintiff alleges that her Seafarer Agreements referenced a Part B, which sets out the standard terms and conditions of her employment ("Part B"). (Id. ¶ 108.) Part 15.1 of Part B provides that any grievance "must be referred to arbitration to the exclusion of any other legal or court proceeding." (Id. ¶ 109.) Part 15.2 of Part B provides that:

> In the absence of a controlling CBA or government-mandated contract containing a dispute resolution provision or procedure, every conceivable dispute (including but not limited to wage and benefit members, xxx) between you and the Company or others . . . shall be resolved by binding arbitration. The parties agree that any and all claims between them of any kind or nature whatsoever are international commercial disputes and shall be referred to and resolved exclusively by binding arbitration in Bermuda (in English), to the exclusion of any other fora . . .

(Id. ¶ 110.) Part B also specifies that the "Agreement shall be governed by the law of Bermuda." (Id. ¶ 111.)[1]

Defendants submitted several exhibits to the court along with their motion to compel. These included three Part A's bearing Plaintiff's signature covering the following periods: August 27, 2015 through February 17, 2016 (Seafarer's Employment Agreement Part A 2015 ("2015 Part A") (Dkt 18-3)); September 1, 2016 through March 2, 2017 (Seafarer's Employment Agreement Part A 2016 ("2016 Part A") (Dkt 18-4)); and July 9, 2017 through October 3, 2018 (Seafarer's Employment Agreement Part A 2017 ("2017 Part A") (Dkt 18-5)). Defendants also submitted a copy of Part B, the Standard Terms and Conditions of Employment, "in effect for Plaintiff's contracts at issue." (Decl. in Support of Defs. Mot. to Compel (Dkt. 18-2) ¶ 5.) This

---

[1] Plaintiff includes this discussion of the arbitration clause in her complaint in order to preempt Defendants' "expect[ed] . . . move to compel the arbitration of their claims in Bermuda using Bermuda law, pursuant to Part B of the Seafarer Agreement." (Compl. ¶ 112.) Plaintiff seeks a declaration by the court that the "arbitration provisions contained in Part B of Plaintiff's Seafarer Agreement clearly operate . . . as a prospective waiver of her rights to pursue U.S. statutory remedies." (Compl. ¶ 128.)

3

Part B was current as of April 1, 2015. (Part B3 – Standard Terms and Conditions ("2015 Part B") (Dkt. 18-6).)

Plaintiff does not dispute the validity of any of the exhibits submitted by Defendants (except to contend, as discussed below, that the lack of a signature on Part B is fatal to Defendants' motion) nor does she argue that the other Part A's that she allegedly signed differed in any material way from those submitted by Defendants. (See Pl. Opp'n (Dkt. 19).) Indeed, the language she quotes and cites in the complaint and in her brief is entirely consistent with the language in the Part A's and Part B submitted by the Defendants. (See Compl. ¶¶ 107-16; Pl. Opp'n at 3-7.)[2]

Part A is a single-page contract divided into six sections. (See 2015 Part A; 2016 Part A; and 2017 Part A.) Section 6 is entitled "Terms and Conditions," and is further divided into three subsections: Section 6.1—"Collective Bargaining Agreement;" Section 6.2—"Standard Terms & Conditions of Employment;" and Section 6.3—"Protected Terms & Conditions of Employment – Part C." (Id.) With respect to Section 6.1, the contract states "There is no Collective Bargaining Agreement governing your employment." (Id.) Similarly, Section 6.3 in the 2015 and 2016 agreements says "Not applicable" (2015 Part A; 2016 Part A), and Section 6.3 in the 2017 agreement says "There are no Protected Terms and Conditions governing your employment" (2017 Part A). Section 6.2 in each of these agreements reads: "Part B of your Employment

---

[2] While Plaintiff points out that "Defendants failed to produce a Part B or 'B3' of the Seafarers Employment Agreement that was signed or executed by the Plaintiff" (Pl. Opp'n at 5), she does not contest that the Part B submitted along with Defendants' motion to compel was in fact the Part B in effect at the time Plaintiff signed Part A. Instead, she simply surmises that because Plaintiff did not sign Part B, "there is no certainty that the unsigned document submitted herein by Defendants as Part B 'B3' is exactly the same as the one being referred to in the Part A that was signed by Plaintiff." (Pl. Opp'n at 5.) However, because Part B does not have a signature block, the lack of a signature on this document does not raise concerns. The court does note that the Part B submitted by Defendants states that it was current as of April 1, 2015, meaning that it was not the operative document for the first eight years of her employment. Plaintiff's allegations, however, are not so limited, and because the court finds that Plaintiff's allegations alone are sufficient to support a finding that an arbitration clause was incorporated into each Part A signed by Plaintiff over the course of her employment, the court does not concern itself with this issue.

4

Agreement is attached setting out all the standard terms and conditions of employment relating to your rank and position, referenced as B3." (2015 Part A; 2016 Part A; 2017 Part A.) This language is consistent with the language quoted in Plaintiff's filings. (See Pl. Opp'n at 3 (quoting identical language from "Section 6.2 of Part A of the Seafarers Employment Agreement"); Compl. ¶ 108 (noting that "Plaintiff's Seafarer Agreement references a Part B which sets out the standard terms and conditions of her employment.").)

Above the signature block on Part A is a section titled "Acceptance of Employment *(Please read carefully before signing)*." (2015 Part A; 2016 Part A; and 2017 Part A.) This section begins:

> By signing all of the terms and conditions set out and referred to in Parts A, B, and, where applicable, Part C of this Agreement and/or the terms set out in a Collective Bargaining Agreement, employee freely accepts them, confirms that they have had sufficient opportunity to review and seek advice on them, and clearly understands their full terms and conditions, rights and responsibilities. Employee retains a signed copy of their full Employment Agreement, which consists of all relevant documents referred to above and retains copies of the key policies referred to within their Employment Agreement.

(2015 Part A; 2016 Part A; 2017 Part A.) This section, identical in each of the Part A's submitted by Defendants, is also quoted in part in Plaintiff's brief. (Pl. Opp'n at 3 (quoting the first sentence of this passage with the introduction: "Part A likewise states the following important language").) Part A concludes with the instruction: "Please continue to Part B (and C if applicable) which sets out the standard terms and conditions applicable to your employment." (2015 Part A; 2016 Part A; 2017 Part A.)

The heading of Part B identifies it as "Part B3 – Standard Terms and Conditions – Fixed Term Employment." (2015 Part B; see also Compl. ¶ 108 (alleging that Part A references a Part B setting out standard terms and conditions of employment).) The Part B submitted to the court by Defendants, current as of April 1, 2015, begins: "The following constitutes your Standard

Terms and Conditions of Employment and is part of your Seafarers Employment Agreement. Please read in conjunction with all other parts." (2015 Part B.) Section 15 of Part B is entitled: "ARBITRATION, VENUE AND RESOLUTION OF CLAIMS, CONTROVERSIES OR DISPUTES." (Id. at 8.) Section 15.1 provides that "[a]ny grievances . . . must be referred to arbitration to the exclusion of any other legal or court proceeding as set forth below." (Id.; Compl. ¶ 109 (quoting the same language).) Section 15.2 provides, among other things, that "every conceivable dispute (including but not limited to wage and benefit matters . . .) between you and the Company or others . . . shall be resolved by binding arbitration." (2015 Part B; see Compl. ¶ 110 (quoting the same language).)

### B. Procedural History

Plaintiff commenced this action on November 29, 2017. (Compl.) She asserts five causes of action. First, she alleges that Defendants failed to fully or properly pay her wages in violation of the Seaman's Wage Act, 46 U.S.C. § 10313. (Id. ¶¶ 72-86.) Plaintiff also asserts three claims under New York Labor Law Article 6 based on Defendants' alleged failure to pay her agreed-upon wages (id. ¶¶ 87-92), unauthorized deductions from Plaintiff's wages (id. ¶¶ 93-100), and unlawful retention of gratuities or service charges meant to be paid to Plaintiff (id. ¶¶ 101-105). Finally, Plaintiff seeks a declaration pursuant to 28 U.S.C. § 2201 that the arbitration clause and choice of law provisions in Part B of the Seafarer Agreements are unenforceable because they operate as a prospective waiver of Plaintiff's rights and are therefore against public policy. (Id. ¶¶ 106-28.)

Defendants now move to compel arbitration and dismiss pursuant to the Convention, Federal Rule of Civil Procedure 12(b)(3),[3] and the terms of the Seafarer Agreements on the grounds that the agreements require that any disputes with Defendants be arbitrated in Bermuda under Bermuda law. (Mem.) Plaintiff opposes this motion on several grounds, including that the agreement to arbitrate, which is contained in a standard terms and provisions document, was not properly incorporated by reference into the portion of her contracts that she executed. (See Pl. Opp'n.)

## II. DISCUSSION

"[A] district court's scope of inquiry in considering a petition to compel arbitration under Chapter Two of the FAA is 'very limited.'" Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir.1999) (quoting Ledee v. Ceramiche Ragno, 684 F.2d 184, 186 (1st Cir. 1982)). The court must determine (1) whether jurisdictional prerequisites demonstrate that the Convention applies and (2) whether one of a limited set of affirmative defenses precludes enforcement of the arbitration agreement. See Bautista v. Star Cruises, 396 F.3d 1289, 1294-95 (11th Cir. 2005). If the Court finds that the jurisdictional prerequisites have been met and none of the Convention's affirmative defenses apply, then the court must order arbitration. Id.; Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1018 (2d Cir. 1993) (citing Convention, art. II(3)).

In considering a motion to compel arbitration, the court "applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d

---

[3] Although Defendants state that they are moving pursuant to Federal Rule of Civil Procedure 12(b)(3) (Def. Mem. at 1), the Motion does not address Rule 12(b)(3).

7

Cir. 2003); see Pagaduan v. Carnival Corp., 709 F. App'x 713, 719 (2d Cir. 2017) (summary order).

### A. Jurisdiction

There are four basic requirements for enforcement of arbitration agreements under the Convention: (1) there must be a written agreement; (2) the written agreement must provide for arbitration in the territory of a signatory of the Convention; (3) the subject matter of the agreement must be commercial; and (4) the agreement must not be entirely domestic in scope. See Smith/Enron, 198 F.3d at 92. In determining whether the four jurisdictional prerequisites are met, the court is mindful that federal law strongly favors agreements to arbitrate, especially in international commercial transactions. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974); Bautista, 396 F.3d at 1295.

Plaintiff contests only the first jurisdictional prerequisite—whether a written agreement to arbitrate existed. (See Pl. Opp'n.) Plaintiff admits to having entered into approximately nine employment contracts with Defendants to work aboard the Queen Mary 2 between 2007 and 2018. (Compl. ¶ 19; Pl. Opp'n at 2-7.) She alleges in the complaint that these employment agreements subjected her to an arbitration provision, contained in a Part B. (Compl. ¶¶ 108-28 (referring, e.g., to "[t]he arbitration clause in Plaintiff's Seafarer Agreement").) Nonetheless, in her opposition brief, Plaintiff contends that there is no written agreement to arbitrate because the section of the Seafarer Agreements that she signed—Part A, entitled the "Individual Terms"— did not contain an arbitration provision. (Pl. Opp'n at 2-7.) Moreover, despite the allegations in the complaint, she argues that Part A did not incorporate by reference the arbitration agreement contained in Part B. (See Compl. ¶¶ 17, 108-11; Pl. Opp'n at 2-7.) Defendants do not contest that Part A lacked an arbitration provision, but they insist that each Part A signed by Plaintiff

8

expressly incorporated the Standard Terms and Conditions in Part B, which did include an arbitration provision. (Mem. at 6; Reply (Dkt. 20) at 3-4.)

For the reasons set forth below, the court agrees with Defendants and finds that there was a written agreement to arbitrate between the parties during all relevant periods.

1.     Choice of Law

Before turning to the question of whether the Part A's signed by Plaintiff properly incorporated Part B and its arbitration provision, the court must address a threshold issue concerning applicable law. Plaintiff argues that state-law contract principles generally apply in an inquiry into the making of an agreement. (Pl. Opp'n at 10 (citing Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005); Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87 (1996).) Defendants do not address the issue. (See Reply at 2-4.)

The Second Circuit has explained that "[w]hen we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable." Smith/Enron, 198 F.3d at 96 (citations omitted) (noting that "as this is a federal question case under 9 U.S.C. § 203 and not a diversity case, we see no persuasive reason to apply the law of New York simply because it is the forum of this litigation"); see Republic of Ecuador v. ChevronTexaco Corp., 376 F. Supp. 2d 334, 353 (S.D.N.Y. 2005) (in summary judgment case concerning the Inter–American Convention on International Commercial Arbitration, recognizing "a line of Second Circuit authority supporting the application of federal common law to questions [of whether a party is bound by an agreement to arbitrate], particularly in cases arising under [the Convention]"); cf. Pescatore v. Pan Am. World Airways, 97 F.3d 1, 12 (2d Cir. 1996) (noting that the law is unsettled when it comes to applying federal common law or state common law in

non-diversity cases)). "[W]here there is little connection to the forum and the Agreements between the parties state an intention to be governed by the FAA," Smith/Enron explains, "proceeding otherwise would introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of simplifying and unifying international arbitration law." Id. In Sarhank Group v. Oracle Corp., 404 F.3d 657, 661-62 (2d Cir. 2005), the Second Circuit reaffirmed that "[i]t is American federal arbitration law that controls" the question of whether an American nonsignatory can be bound to arbitrate in a Convention case, because "[t]o hold otherwise would defeat the ordinary and customary expectations of experienced business persons." Id.

That federal law is the appropriate body of law to be applied to this question is given further support by the fact that Plaintiff's complaint is brought pursuant to the Seaman's Wage Act, 46 U.S.C. § 10313, "and the general maritime laws of the United States," (Compl. ¶ 2), meaning that the court derives its jurisdiction from 28 U.S.C. § 1331 and 28 U.S.C. § 1333. See Wallace v. NCL (Bahamas) Ltd., 891 F. Supp. 2d 1343, 1349 (S.D. Fla. 2012), aff'd, 733 F.3d 1093 (11th Cir. 2013) (observing that federal court had jurisdiction over Seaman's Wage Act claim under 28 U.S.C. § 1333 because it was a "civil case of admiralty or maritime jurisdiction"); cf. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir. 1993) (noting, in a case arising under Chapter One of the FAA, that "[a]s a federal court sitting in a diversity case, we must apply the choice of law rules of the state in which the action was brought"). The Supreme Court has explained that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 22-23 (2004).

It follows, therefore, that the law governing this case is to be found in the federal cases, particularly those of the Second Circuit, that address under what circumstances a nonsignatory party to an arbitration agreement may nonetheless be bound by its terms. See Intertec Contracting A/S v. Turner Steiner Int'l, S.A., No. 98-CV-9116 (CSH), 2000 WL 709004, at *7 (S.D.N.Y. May 31, 2000) (applying federal law to the question of whether an arbitration clause was incorporated by reference into a contract between the parties), aff'd, 6 F. App'x 61 (2d Cir. 2001). The Second Circuit has made clear that a nonsignatory party may be bound to an arbitration agreement "according 'ordinary principles of contract and agency.'" Smith/Enron, 198 F.3d at 97 (quoting McAllister Bros. v. A & S Transp. Co., 621 F.2d 519, 524 (2d Cir. 1980); Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)). These principles include incorporation by reference. Id. (citing Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)).

"A contract may incorporate another document by reference by describing it in such clear and unambiguous terms that its identity can be ascertained beyond reasonable doubt." Pagaduan, 709 F. App'x at 715-16 (citing Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 (2d Cir. 1993); Glencore Ltd. v. Degussa Engineered Carbons L.P., 848 F. Supp. 2d 410, 428 n.14 (S.D.N.Y. 2012); Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 395 (2d Cir. 2011)); see New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 30 (2d Cir. 1997) ("Under general principles of contract law, a contract may incorporate another document by making clear reference to it and describing it in such terms that its identity may be ascertained beyond doubt.") Maritime contracts frequently incorporate by reference other documents and industry terms and conditions. See, e.g., Son Shipping Co. v. De Fosse & Tanghe, 199 F.2d 687, 688 (2d Cir. 1952) (finding that bills of lading clearly incorporated

arbitration clause in a charter party). Whether a document is incorporated by reference is a matter of law, and a trial is not required to discard a contrary interpretation urged by one party. See Progressive Cas. Ins. Co., 991 F.2d at 47 & n.8 (disagreeing with the district court's ruling that a trial was necessary to determine whether a contract identified another document "with sufficient specificity to incorporate it by reference" and observing that the contract "specifically and directly identifies the [other document] by name").

2. Analysis

The court finds that the executed portion of Plaintiff's contracts—the "Part A's"—clearly and unambiguously reference and describe Part B, which contained an arbitration provision. (See Compl. ¶¶ 109-110; Pl. Opp'n at 5; 2015 Part B.) Part A informs employees that "Part B of your Employment Agreement is attached setting out all the standard terms and conditions of employment relating to your rank and position, referenced as B3." (Pl. Opp'n at 3; see Compl. ¶ 108.) Part A also states that "[b]y signing all of the terms and conditions set out and referred to in Parts A, B, and, where applicable, Part C of this Agreement . . . employee freely accepts them . . ." (Pl. Opp'n at 3-4, 6.) These clauses each incorporate Part B into Part A. Part B includes a clear arbitration clause. (Compl. ¶¶ 109-11; 2015 Part B.) The court thus concludes that Part B's arbitration clause is incorporated by reference into Part A.

Plaintiff contends that because Part A did not include certain "magic words," such as "determined in accordance with" or "subject to," it cannot have incorporated Part B by reference. (Pl. Opp'n at 5.) However, "a requirement that contract language be explicit or otherwise clear and precise does not amount to a rule that contracting parties must use a rote phrase or a formalistic template to effect an incorporation by reference." Northrop Grumman Info. Tech.,

Inc. v. United States, 535 F.3d 1339, 1345 (Fed. Cir. 2008) (explaining that the court "does not require 'magic words' of reference or of incorporation").

Moreover, contrary to Plaintiff's argument that Part A failed to "incorporate[] by reference 'arbitration' in Bermuda" because it "does not mention that Part B refers also to terms and conditions about grievance mechanisms or dispute resolution process" (Pl. Opp'n at 3, 5), a contract need not specify that the incorporated document contains an arbitration provision in order to effect incorporation of that provision. See Pagaduan v. Carnival Corp., 709 F. App'x at 716 (finding that plaintiff was subject to arbitration clause where single-page employment contract did not contain an arbitration provision "on its face" but nonetheless "clearly and unambiguously describe[d] the documents whose terms would apply to [the plaintiff's] employment," and one of those terms called for arbitration of disputes).

Finally, the court disagrees with Plaintiff's contention that she cannot be bound by the provisions of Part B because she did not sign it. (Pl. Opp'n at 3-4, 6.) Plaintiff argues that the following language, located above the signature line in Part A, signifies that Plaintiff needed to sign Part B to be bound by it: "By signing all of the terms and conditions set out and referred to in Parts A, B, and, where applicable, Part C of this Agreement . . . employee freely accepts them . . ." (Pl. Opp'n at 3-4, 6.) The court is not convinced by Plaintiff's interpretation; on the contrary, the court finds that this language actually further serves to incorporate the provisions of Part B into Part A. As Defendants note, Part B does not even contain a signature line. (Reply at 20.) See Pagaduan, 709 F. App'x at 717 (observing that the defendant, Carnival, did not need to prove that plaintiff "signed both the Contract of Employment and the documents incorporated by reference into that contract at the same time" for the court to find that plaintiff was "bound by the terms of this contract, including the arbitration clause"); Lamb v. Emhart Corp., 47 F.3d 551,

558 (2d Cir. 1995) ("Incorporation by reference produces a single agreement out of the incorporated documents and the contract itself.").

Plaintiff also protests that Part B was not explained to her at the time of signing and that "she did not understand what 'arbitration' was all about." (Pl. Opp'n at 1.) This contention does not, however, rebut "the powerful presumption in favor of enforcing freely negotiated contracts, especially in the arbitration context." Pagaduan, 709 F. App'x at 716 (rejecting plaintiff's claims that "he was unaware of the arbitration clause; that he was never told about it; and that he never consented to incorporation by reference of any additional terms"); see Bautista v. Star Cruises, 396 F.3d 1289, 1301 (11th Cir. 2005) ("In the limited jurisdictional inquiry prescribed by the Convention Act, we find it especially appropriate to abide by the general principle that one who has executed a written contract and is ignorant of its contents cannot set up that ignorance to avoid the obligation absent fraud and misrepresentation." (quotation marks and citation omitted) (alteration adopted)). The same rules apply to terms incorporated by reference. See Pagaduan, 709 F. App'x at 716; 4Connections LLC v. Optical Commc'ns Grp., Inc., 618 F. Supp. 2d 178, 183-84 (E.D.N.Y. 2009) ("A party's failure to read the terms of an incorporated document does not make those terms any less binding.").

Because the court finds that Part B's arbitration agreement was incorporated by reference into the portion of the employment agreements that Plaintiff signed, the court finds that a written agreement to arbitrate existed between the parties. The jurisdictional requirements of the Convention are thus satisfied.

### B. Affirmative Defenses

The Convention specifies certain defenses to arbitration that may be asserted at two separate stages of enforcement—the initial arbitration-enforcement stage and the later award-

enforcement stage. Article II of the Convention applies at the initial arbitration-enforcement stage:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Convention, art. II(3). The Convention's "null and void" defense has a "limited scope" and has been interpreted to encompass "only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." Apple & Eve, LLC v. Yantai N. Andre Juice Co., 610 F. Supp. 2d 226, 228 (E.D.N.Y. 2009) (quoting Bautista, 396 F.3d at 1302).

Article V of the Convention, on the other hand, enumerates seven defenses that apply at the award-enforcement stage. See Convention, art. V (listing seven instances where "[r]ecognition and enforcement of the award may be refused" by "the competent authority where the recognition and enforcement is sought"); see also 9 U.S.C. § 207 (providing "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"). One of Article V's seven defenses is the "public policy" defense, which states:

> Recognition and enforcement of an arbitral award may [] be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country.

Convention, art. V(b)(2).

For the following reasons, the court finds that Plaintiff's asserted defenses fail.

1.  Article V

First, Plaintiff argues that even if the court recognizes the existence of a written agreement to arbitrate, Defendants' motion to compel arbitration should be denied under Article V of the Convention because Part B's arbitration clause and choice of law provision—which specifies that Bermuda law will apply—operate together to "effectuate a waiver of [Plaintiff's] statutory rights in violation of public policy." (Pl. Opp'n at 16 (citing Article V of the Convention).)

This prospective waiver theory derives from the Supreme Court's decision in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc, 473 U.S. 614 (1985), in which the court addressed a district court's enforcement of an agreement to arbitrate that forced an auto dealer to arbitrate its antitrust claims under the Sherman Act, 15 U.S.C. § 1 et seq., in Japan. Id. The court commented, in dictum in a footnote, that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." Id. at 637 n.19. Similarly, in Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540-41 (1995), the court, again in dictum, suggested that Mitsubishi's prospective-waiver doctrine might apply to contracts under the Carriage of Goods by Sea Act, 46 U.S.C. app. § 1300 et seq. Id. In both cases, however, the court declined to apply the doctrine at the arbitration-enforcement stage in part because it would have been premature to do so. See Mitsubishi, 473 U.S. at 637 n. 19; Vimar, 515 U.S. at 540.

In support of her contention that the prospective waiver defense nonetheless should be applied here to deny Defendants' motion to compel arbitration, Plaintiff relies heavily on an Eleventh Circuit case, Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009). In Thomas,

the court refused to enforce a plaintiff's arbitration agreement as to his Seaman's Wage Act claim on the grounds that the arbitration clause was "null and void as a matter of public policy," id. at 1124 n.17, because it operated as a "'prospective waiver of parties' rights to pursue statutory remedies' without the assurance of a 'subsequent opportunity for review,'" id. at 1124 (quoting Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540 (1995)).

As an initial matter, the court finds that Plaintiff misconstrues Article V. Article V (including its public policy defense), by its terms, applies only at the award-enforcement stage, and not at the initial arbitration-enforcement stage. See Convention, art. V(b)(2). In contrast, Article II, which does apply at this initial stage, "contains no explicit or implicit public policy defense." Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1263 (11th Cir. 2011); see Convention, art. II(3).

The court also notes that the Eleventh Circuit has rejected its earlier holding in Thomas. In Lindo, considering whether a plaintiff seaman's contract was "void as against public policy because it operated as a prospective waiver of his Jones Act claim," the Eleventh Circuit held that "to the extent Thomas allowed the plaintiff seaman to prevail on a new public policy defense under Article II [i.e., at the arbitration-enforcement stage as opposed to the award-enforcement stage], Thomas violates Bautista and our prior panel precedent rule." Lindo, 652 F.3d at 1278 (concluding, after a thorough review of Supreme Court and Eleventh Circuit cases "enforcing forum-selection and choice-of-law clauses in contracts that require (1) suit or arbitration in a non-American forum, (2) application of non-American law, or (3) a combination thereof," that plaintiff "[could ]not raise an Article V public policy defense at th[e] initial arbitration-enforcement stage").[4]

---

[4] The Eleventh Circuit explained that the Supreme Court precedents in this area:

Recently, a court in this district rejected a similar "prospective waiver" defense on a motion to compel arbitration. See Lucina v. Carnival PLC & Fleet Maritime Services International, Ltd., No. 17-CV-6849 (CBA), 2019 WL 1317471, at *7 (E.D.N.Y. Mar. 22, 2019). The court explained that the "prospective waiver defense applies only where 'there [is] no subsequent opportunity for review' and where the Court is 'persuaded that the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies.'" Id. (quoting Vimar, 515 U.S. at 540 (internal quotation marks and citation omitted)). In contrast, where, as here, "the [c]ourt can 'retain[ ] jurisdiction over the case and will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the ... laws [will] be[ ] addressed,' there is not cause to invalidate an arbitration clause." Id. (quoting Vimar, 515 U.S. at 540 (internal quotation marks and citation omitted)).

In any event, as Defendants note, Plaintiff has failed to show that the choice-of-law and choice-of-forum provisions here "operate[] in tandem as a prospective waiver of a party's right to pursue statutory damages." Mitsubishi, 473 U.S. at 637 n.19. Indeed, Defendants provide an affidavit from an Acting Judge of the Supreme Court of Bermuda, explaining that Bermuda law

---

propound several overarching themes: (1) courts should apply a strong presumption in favor of enforcement of arbitration and choice clauses; (2) U.S. statutory claims are arbitrable, unless Congress has specifically legislated otherwise; (3) choice-of-law clauses may be enforced even if the substantive law applied in arbitration potentially provides reduced remedies (or fewer defenses) than those available under U.S. law; and (4) even if a contract expressly says that foreign law governs, as in Vimar, courts should not invalidate an arbitration agreement at the arbitration-enforcement stage on the basis of speculation about what the arbitrator will do, as there will be a later opportunity to review any arbitral award.

Lindo v. NCL (Bahamas), Ltd., 652 F.3d at 1269 (discussing Mitsubishi, 473 U.S. 614; Vimar, 515 U.S. 528; Scherk, 417 U.S. 506; M/S Bremen v. Zapata Off–Shore Co., 407 U.S. 1 (1972)). The court noted that "[i]n the two instances the Supreme Court has quoted the language of Article V's public policy defense, it has indicated that it is to be applied at the award-enforcement stage, not at the arbitration-enforcement stage." Id. at 1281 (citing Scherk, 417 U.S. at 519 n. 14; Mitsubishi, 473 U.S. at 638)).

18

provides for a choice-of-law analysis, that Bermuda judges and arbitrators have extensive experience applying international law, and that parties appearing in a Bermuda court or arbitration proceeding may argue that there are grounds to apply other laws. (Decl. of Rod S. Attride-Stirling (Dkt. 20-1) ¶¶ 12-15.) This declarant also states that Bermuda law provides remedies for seafaring employees claiming breaches of the duty to fully and timely pay salary and gratuities. (Id. ¶ 4.) Plaintiff has failed to establish either that a Bermuda arbitrator would categorically refuse to apply New York law, or that application of Bermuda law would be "fundamentally unfair." See Lindo, 652 F.3d at 1283 (explaining that, even assuming, arguendo, that plaintiff could "somehow raise an Article V public policy defense at the arbitration-enforcement stage," his challenge to the arbitration agreement would still fail because he could not show that the remedy available under foreign law is "so inadequate that enforcement would be fundamentally unfair")

Accordingly, the court finds that Plaintiff cannot raise an Article V public policy defense at the motion to compel arbitration stage.

## III. CONCLUSION

For the reasons stated above, Defendants' Motion to Compel Arbitration is GRANTED. The court retains limited jurisdiction to enforce any award resulting from the arbitration. The parties are DIRECTED to file a letter notifying the court of the results of the arbitration and their intent to enforce any arbitral award before the court.

SO ORDERED.

Dated: Brooklyn, New York
      March 29, 2019

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge